**In re John S. CHWAT, Debtor.**

**Robert E. WEIGEND, Jr., Plaintiff,**

**v.**

**John S. CHWAT, Defendant.**

**Bankruptcy No. 94–12131–AT.**
**Adversary No. 94–1395.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Sept. 16, 1996.

John O. Long, III, Gold & Stanley, P.C., Alexandria, VA, for Plaintiff.

Steven B. Ramsdell, Tyler, Bartl, Burke & Albert, Alexandria, VA, J. Alan Galbraith, Williams & Connolly, Washington, DC, for Debtor.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

Trial was held on plaintiff's complaint to except a debt from discharge under 11 U.S.C. § 523(a)(4) and (6) on March 28, 1996. The grounds asserted are that debtor embezzled property from a partnership in which plaintiff and debtor were partners. The complaint also alleges that debtor willfully

and maliciously injured plaintiff's partnership interest. Oral argument was held on April 24, 1996, following which the court took the matter under advisement.

This opinion constitutes the court's findings of fact and conclusions of law as required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

For reasons stated below judgment will be entered against debtor in the amount of $5,215.00.

### Findings of Fact

On October 22, 1981, plaintiff Robert E. Weigend, Jr., entered into a partnership with debtor John S. Chwat, known as Chwat Weigend Associates. The partnership had its principal place of business in Washington, D.C., and was in the business of providing lobbying services. Pursuant to the partnership agreement, the partners were to share profits and losses equally and were to have an equal voice in the management of the partnership. The agreement also granted each partner the right to withdraw from the partnership on 60 days notice.

From 1981 to 1990, the partnership operated harmoniously. Debtor performed a large majority of the actual lobbying work outside of the office while plaintiff was primarily responsible for office management.

On August 1, 1990, the partnership moved to new office space in Washington, D.C. The new space was much more expansive and luxurious than that of the prior location and was also more expensive. Under the new lease, no rent was due for the first nine months, after which rent was $8,000.00 per month, nearly double that at the prior location.

Recognizing that taking on such an increase in rent made the future of the partnership uncertain, the partners executed an amendment to the October 22, 1981, partnership agreement on February 5, 1991. The amendment allowed each partner to undertake outside employment as long as the employment did not interfere with the business of the partnership. The amendment further provided that, in the event one of the partners devoted less than full time work to the

partnership, compensation of the partners could be adjusted to reflect the amount of work performed by each partner.

Plaintiff took advantage of the amendment and opened a game store in Chantilly, Virginia. This new business limited the time plaintiff could spend at the partnership office but helped to ensure him a source of future income.

The partners hoped that the move to the new location would attract larger clients for the partnership, thus generating sufficient revenue to pay the increased rent. Contrary to these expectations, however, the partnership actually began to lose clients after entering into the lease. During 1991, the National Licensed Beverage Association (NLBA), a client of the partnership, began to experience financial difficulties of its own and fell into default on its payments to the partnership. In April 1992, the partnership's largest client, the National Exchange Carriers Association, opened its own lobbying office and did not renew its contract with the partnership. The partnership also lost as a client Eduardo Cojuangco, who was a candidate for the presidency of the Phillippines. The loss of these clients, the failure to attract the hoped for larger clients, and the end of the nine month rent free period all combined to have a serious negative impact on the finances of the partnership. On July 24, 1992, the partnership terminated the employment of plaintiff's wife, Cynthia Weigend, an employee of the partnership for over ten years.

As the financial condition of the partnership began to deteriorate, so did the relationship of the partners, and they began to discuss dissolution. By September 1992, both partners wished to dissolve the partnership but were unable to agree to terms. A major stumbling block was the fact that both had personally guaranteed the new lease, and the landlord was unwilling to release them. On September 30, 1992, the partners discussed a wide range of issues including a proposal that debtor would be entitled to a five to one draw in order to insure debtor enough income so that he could afford to continue working for the partnership. Debtor did agree to sign a $50,000.00 promissory note payable to plain-

tiff for the purpose of assuring plaintiff that he would be repaid for the unequal capital contributions he had made during the existence of the partnership. The partnership was primary obligor on the note; debtor was liable only in the event the partnership dissolved.

By letter dated October 14, 1992, debtor informed client NLBA that he was forming his own lobbying firm, Chwat and Company, which was to begin operating at the beginning of 1993. Debtor reminded the NLBA that its current contract with Chwat Weigend Associates was due to expire at the end of the year, and he solicited future business for his new company. On October 28, 1992, the NLBA entered into a retainer agreement with Chwat and Company to secure debtor's services for the first six months of 1993. Debtor's negotiations with the NLBA were undertaken without plaintiff's knowledge. On October 29, 1992, debtor informed plaintiff that he had obtained the NLBA contract on his own behalf and not for the benefit of the partnership.

On October 30, 1992, debtor gave plaintiff written notice of his withdrawal from the partnership. The notice reminded plaintiff of his right to liquidate debtor's interest in the partnership and to continue the business; if plaintiff did not exercise this right, the affairs of the partnership were to be wound up pursuant to Article IX of the partnership agreement.

The notice led to a heated argument between the partners on October 30, 1992. The next day, Saturday, October 31, 1992, debtor returned to the partnership office and removed various items of partnership property. The property taken included active client files, marketing files, partnership financial records for the four previous years, various reference materials, a file cabinet and a facsimile machine. Removal of these items made it nearly impossible for plaintiff to carry on the business of the partnership.

Plaintiff discovered that the property was missing on Monday, November 2, 1992. Also on that day, plaintiff received a letter from debtor explaining that debtor had removed the property as a precautionary measure based on plaintiff's threat on October 30, 1992, to lock up the partnership and prevent it from doing further business. After receiving this letter, plaintiff hired his own counsel. Plaintiff's attorney demanded that debtor return the missing property and denied that plaintiff had made any threat to shut down the partnership. Debtor refused to return the property.

Besides removing partnership property, debtor took other actions to take control of the affairs of the partnership. Debtor initiated a call forwarding service to have all partnership incoming phone calls diverted to debtor's home phone. When plaintiff discovered this, he quickly contacted the phone company and had the service canceled. Debtor had the service reinstated, forcing plaintiff to cancel the service a second time.

Debtor also had the partnership mail held at the post office for pickup by the partners without informing plaintiff. When the partnership stopped receiving mail, plaintiff contacted the post office and was told that the mail was being held. Plaintiff immediately canceled the service. As with the call forwarding service, debtor had the service reinstated, forcing plaintiff to again cancel the service.

When debtor gave his notice of withdrawal from the partnership, plaintiff was in possession of the partnership check book. In order to secure a hold on the partnership's finances, debtor opened a separate bank account at Signet Bank on November 2, 1992, entitled John S. Chwat Escrow Account. Plaintiff had no access to this account. Once the account was established, debtor sent out bills to partnership clients instructing them to make their payments directly to the John S. Chwat Escrow Account.

Because the John S. Chwat Escrow Account was initially funded with only $25.00, debtor needed to obtain access to the partnership account at First American Bank. He gained access to the account by obtaining bank counter checks from First American which allowed him to write checks on the partnership account. Debtor informed plaintiff by letter dated November 4, 1992, that he had obtained the bank counter checks and that he had paid $1,449.22 in overdue part-

nership bills with these checks. After payment of these bills, the partnership account was left with $43.12. This was the balance of the account until December 15, 1992, when debtor deposited a check from a partnership client in the amount of $1,560.00. Debtor immediately withdrew the $1,560.00, however, by writing a check payable to himself on the partnership account in this amount. Later that same day, debtor deposited the $1,560.00 check into the John S. Chwat Escrow Account.

Besides obtaining the bank counter checks, debtor also wrote to First American Bank in an effort to limit plaintiff's ability to withdraw funds from the partnership account. Debtor requested First American to restrict withdrawals by plaintiff to the amount in the account on November 3, 1992, but the bank refused.

Debtor made an initial deposit of partnership funds into the escrow account on November 7, 1992. From that point forward, excepting the December 15, 1992, deposit, debtor deposited all partnership funds that he received into the escrow account. Debtor used these funds to pay partnership bills, including the January 1993 rent.[1] Debtor also withdrew funds from the escrow account to pay himself draws during the months of November and December 1992 in the amount of $8,350.00. After his withdrawal from the partnership became effective, debtor's only action in regard to the escrow account was to deposit a check from the partnership's landlord for overpayment of the January 1993 rent and to write a check for the balance of the account payable to the partnership's landlord in August 1994; this payment followed landlord's successful suit against debtor for non payment of the partnership rent.

Despite the fact that debtor's withdrawal from the partnership was not effective until 60 days after notice of withdrawal had been given, debtor chose to continue his effort to secure partnership clients for Chwat and Company before 60 days elapsed. For example, on November 5, 1992, debtor sent a letter to Eduardo Cojuangco informing him of the breakup of the partnership and debtor's intention to start his own lobbying company. Though not explicit, it is clear that the purpose of the letter was to solicit future business from Eduardo Cojuangco.

Debtor's withdrawal from the partnership became effective on December 31, 1992. Despite repeated demands made by plaintiff, debtor refused to return the partnership property he had removed or to turn over any partnership funds. On March 25, 1993, plaintiff sent debtor a letter informing debtor that plaintiff was exercising his right to continue Chwat Weigend Associates pursuant to Article V, section 5.2 of the October 22, 1981, partnership agreement. The letter went on to state that plaintiff was liquidating debtor's interest in the partnership but that no payment was required because the partnership was worthless (liabilities exceeded assets).

Plaintiff filed a chapter 7 bankruptcy petition on May 28, 1993. On schedule B of his schedules, plaintiff listed the value of his partnership interest in Chwat Weigend Associates as $0.00. Debtor filed the instant chapter 7 petition a year later on May 31, 1994. Plaintiff filed an amended dischargeability complaint in debtor's bankruptcy case on December 12, 1994.

### Discussion and Conclusions of Law

Plaintiff alleges in the first count of his amended complaint that, following the effective date of debtor's withdrawal from the partnership, debtor took property belonging to Chwat Weigend Associates when he refused to return a filing cabinet, facsimile machine and reference materials to plaintiff. Plaintiff also alleges that debtor took $8,350.00 in partnership funds based on partnership draws debtor paid to himself to the exclusion of plaintiff. Plaintiff asserts that this conduct of debtor constituted embezzlement, the debt for which is to be excepted from debtor's discharge under 11 U.S.C. § 523(a)(4).

Plaintiff's second dischargeability ground is that debtor's actions during the latter half

---

**1.** Debtor did not pay the January 1993 rent from the escrow account directly but instead paid the rent with personal funds.

of 1992 were willful and malicious and resulted in injury to plaintiff and plaintiff's partnership interest in Chwat Weigend Associates. Accordingly, plaintiff argues that his damages suffered from this injury should be excepted from debtor's discharge in accordance with 11 U.S.C. § 523(a)(6).

Plaintiff must prove the elements of each count by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286–91, 111 S.Ct. 654, 659–61, 112 L.Ed.2d 755 (1991).

## EMBEZZLEMENT

Embezzlement under Bankruptcy Code § 523(a)(4) has been defined in this district as "the fraudulent misappropriation of property by a person to whom such property has been entrusted, or whose hands it has lawfully come." *See Maneval v. Davis (In re Davis)*, 155 B.R. 123, 130 (Bankr. E.D.Va.1993); *Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr.E.D.Va.1992). The elements for embezzlement are (1) debtor's appropriation of property for debtor's benefit, and (2) appropriation with fraudulent intent or by deceit. *See Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 855 (Bankr.E.D.Va. 1986).

Before addressing the elements for embezzlement, the court will first address debtor's contention that it is a legal impossibility for debtor to have embezzled property or funds belonging to Chwat Weigend Associates, because, as a matter of law, a partner cannot embezzle partnership property. In support of this proposition, debtor cites *Hardesty v. Johnson*, 126 B.R. 343, 346–47 (E.D.Mo.1991); *Faw v. Wiles (In re Wiles)*,

166 B.R. 975, 980 (Bankr.M.D.Fla.1994); *Moore v. Holman (In re Holman)*, 42 B.R. 848, 852 (Bankr.E.D.Mo.1984). This rule is founded on the basic premise that one cannot embezzle one's own property. *See Hardesty*, 126 B.R. at 346.

I accept the rulings of these cases.[2] They all, however, involved alleged embezzlements by active members of partnerships. In our case, plaintiff has limited his allegations of embezzlement to debtor's refusal to return partnership property and funds after December 31, 1992, the effective date of debtor's withdrawal from Chwat Weigend Associates. I therefore conclude that the cases cited by plaintiff do not apply with respect to debtor's actions after December 31, 1992, since he was no longer a partner. It follows that debtor's refusal to return partnership personal property following the effective date of his withdrawal can form the basis for a finding of embezzlement.[3]

Turning to the elements of embezzlement, it is clear that once debtor's withdrawal from the partnership became effective, he was no longer using the filing cabinet, facsimile machine and reference materials that he had removed from the partnership office for the benefit of Chwat Weigend Associates. Thus, although debtor may have been in lawful possession of this property prior to the effective date of his withdrawal, his refusal to return these items after this date was an appropriation of these items for his own benefit.

During the months of November and December 1992, debtor paid himself a total of $8,350.00 in partnership draws from the John S. Chwat Escrow Account. Debtor admitted

**2.** Although Virginia law is silent on this issue, the principle seems to be widely held. *See, e.g.*, John M. Draper, Annotation, *Embezzlement, Larceny, False Pretenses, or Allied Criminal Fraud by a Partner*, 82 A.L.R.3d 823 (1978); Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership* § 3.04 (1996). The court took a contrary view in *In re Bobofchak*, 101 B.R. 465 (Bankr.E.D.Va.1989), but since it did not cite to any relevant authority or state its reasons in depth, I decline to follow the opinion.

**3.** My conclusion that debtor was no longer a partner after December 31, 1992, is supported by the terms of the October 22, 1981 partnership

agreement which gave each partner the right to withdraw from the partnership, effective on 60 days notice. See October 22, 1981, partnership agreement, § 5.1. Debtor no longer had a right to possess partnership property following the effective date of his withdrawal since his ability to possess partnership property following his withdrawal to the detriment of the partnership would have made it impossible for the partnership to continue in business and would render meaningless plaintiff's right to continue the business of the partnership under section 5.2 of the agreement.

that he did not pay corresponding draws to plaintiff.[4]

Unlike the personal property of the partnership which was not appropriated by debtor for his own benefit until he refused to return the property following the effective date of his withdrawal, debtor appropriated the half of the partnership draws which should have been remitted to plaintiff the moment he used these funds for his own benefit. Debtor testified that he used the entire $8,350.00 in partnership draws to pay his living expenses. Though debtor made this general admission, plaintiff did not introduce any evidence as to when debtor actually used the funds for his own benefit.[5] Because the record is so unclear as to when debtor appropriated for himself plaintiff's share of the partnership draws, it is impossible for the court to address the issue of whether debtor possessed the intent necessary for a finding of embezzlement when he appropriated the funds for himself. Accordingly, the court finds that plaintiff has failed to prove that debtor embezzled plaintiff's share of the November and December 1992 partnership draws. Even if, as seems likely, debtor used the funds soon after their withdrawal and prior to December 31, 1992, while he was still a partner, a finding of embezzlement is precluded by the cases previously cited. *See Hardesty*, 126 B.R. at 346.

Thus plaintiff must prove that debtor acted with fraudulent intent or deceit when, after December 31, 1992, he appropriated the office equipment of Chwat Weigend Associates. Plaintiff need not prove that debtor acted out of spite, ill will or hatred but need only prove that debtor acted with intent to wrongfully deprive plaintiff of the partnership property. *See In re Taylor*, 58 B.R. at 855. Fraudulent intent or deceit can

be inferred from the circumstances and can be proven by circumstantial evidence. *See Hyman Wholesale Corp. v. Allman (In re Allman)*, 147 B.R. 122, 125 (Bankr.E.D.Va. 1992); *In re Taylor*, 58 B.R. at 855.

Debtor argues that he could not have acted with fraudulent intent or deceit in regard to his taking sole possession of the personal property of Chwat Weigend Associates because he acted openly and kept plaintiff informed of his actions. The court agrees with debtor to the extent that a finding of fraudulent intent may be negated if a debtor has acted openly without any attempt to conceal but only if that debtor had reasonable grounds to believe that he had a right to possess the property. *See In re Davis*, 155 B.R. at 130. The court cannot find that debtor held a reasonable belief that he had a right to remain in possession of the partnership personal property following the effective date of his withdrawal. Plaintiff's attorney made repeated demands for return of this property. Debtor was fully aware that he was no longer an active partner of Chwat Weigend Associates after December 31, 1992. As a result, the court finds that debtor's refusal to return the filing cabinet, facsimile machine and reference materials was an embezzlement of this property, and the value of plaintiff's share of this property constitutes a debt which must be excepted from debtor's discharge under § 523(a)(4). This leaves the issue of value

Neither party submitted documentary evidence as to the value of the property debtor removed from the partnership office. They agreed that the filing cabinet was worth $80.00 but disagreed as to the other values. Plaintiff testified that the facsimile machine was worth $2,000.00 and the reference materials worth $2,000.00. Debtor believed the

---

4. During November and December 1992, plaintiff was entitled to a 50–50 draw. The October 22, 1981, partnership agreement provided for equal division of profits. Although as part of their September 30, 1992, discussions, the partners discussed a proposal that partnership draws would be distributed in a 5:1 ratio in favor of debtor, the court finds that any agreement between the partners to issue draws in a 5:1 ratio was no longer in effect in November and December 1992. Therefore, plaintiff was entitled to one half of the profits paid to the partners during the

months of November and December 1992 in accordance with the partnership agreement.

5. Plaintiff did introduce evidence as to when debtor paid himself the partnership draws from the John S. Chwat Escrow Account. These payments, however, are not in themselves an appropriation of partnership funds for debtor's own benefit. It was not until debtor used the funds that should have been turned over to plaintiff that he appropriated the funds for himself.

facsimile machine to be worth approximately $500.00 and the reference materials worth far less than $2,000.00. Based on the testimony of the parties, the court finds the combined value of the facsimile machine and the reference materials to be $2,000.00 and the filing cabinet $80.00.

Accordingly, judgment will be entered in favor of plaintiff in the amount of $1,040.00 representing plaintiff's one half of the value of the embezzled office equipment. This value will be excepted from debtor's discharge under § 523(a)(4).

## WILLFUL AND MALICIOUS INJURY

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury to an entity or to the property of an entity." 11 U.S.C. § 523(a)(6). This court has defined willful as " 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury." *Rountrey v. Lee (In re Lee)*, 90 B.R. 202, 207 (Bankr.E.D.Va.1988).

As for maliciousness, our court of appeals has held that § 523(a)(6) does not require a plaintiff to prove specific malice on the part of the debtor. *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1010 (4th Cir.1985). Instead, a showing of implied malice, which may be inferred from the acts and conduct of the debtor in the context of the surrounding circumstances, is sufficient. *See St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1010; *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986); *Traditional Indus., Inc. v. Ketaner (In re Ketaner)*, 149 B.R. 395, 400 (Bankr.E.D.Va.1992), *appeal dismissed*, 154 B.R. 467 (E.D.Va.1993). Under this standard, an act done deliberately and intentionally in disregard of the rights of another constitutes implied malice.

Debtor does not dispute, and there is no doubt, that debtor's actions during the latter half of 1992 were deliberate and intentional. Solicitation of partnership clients for his own benefit while still a partner of Chwat Weigend Associates, removal of partnership property from the partnership office on October 31, 1992, payment of partnership draws to himself to the exclusion of plaintiff and establishment of the John S. Chwat Escrow Account were all affirmative actions taken by debtor. The fact that debtor acted intentionally and deliberately is reinforced by the fact that debtor not only undertook these actions, but following most of them debtor wrote to plaintiff to make sure plaintiff was well aware that debtor had taken these actions.

There is no question that some of these actions resulted in direct injury to plaintiff. Debtor's failure to pay corresponding draws to plaintiff during November and December 1992 deprived plaintiff of $4,175.00 (one half of the $8,350.00 debtor paid to himself during this period). Debtor's refusal to return the personal property of the partnership to plaintiff following the effective date of his withdrawal also injured plaintiff directly as it deprived plaintiff of the value of this property, already determined by the court to be $1,040.00.

It is also clear that if plaintiff's partnership interest had any value, that value would have been injured by debtor's actions. Certainly debtor's solicitation of partnership clients while still a partner of Chwat Weigend Associates was injurious to plaintiff's partnership interest. Debtor's actions following his notice of withdrawal from the partnership on October 30, 1992, had a direct impact on plaintiff's partnership interest. According to their partnership agreement, each partner was to have an equal voice in the management and conduct of the partnership. Following his notice of withdrawal, debtor admittedly prevented plaintiff from exercising any control over the operation of the partnership. Debtor's letter to plaintiff dated November 2, 1992, states that debtor removed "essential working client files and several material supporting assets." Debtor had the partnership mail held at the post office and also had partnership phone calls forwarded to his home phone without plaintiff's knowledge or consent. The institution of these measures, coupled with the removal of essential partnership property, rendered it impossible for plaintiff to service partnership clients and carry on the business of the partnership.

Debtor effectively shut plaintiff out of the partnership finances. Plaintiff had no access to the partnership funds deposited in the John S. Chwat Escrow Account, where near-

ly all of the partnership funds were deposited in November and December 1992 due to debtor's successful effort in having partnership clients send payment directly to debtor. Debtor also attempted to limit plaintiff's ability to withdraw funds from the partnership account at First American Bank by requesting that First American restrict withdrawals from the account to the balance of the account on November 3, 1992.

Debtor's conduct was clearly calculated to ensure his control of the partnership and to exclude plaintiff from having any influence over the partnership following debtor's notice of withdrawal from the partnership on October 30, 1992. The resulting injury to plaintiff's partnership interest was a natural and foreseeable consequence of debtor's actions which were beyond question willful.

Debtor argues that, even if the court finds his actions were willful, any debt stemming from an injury to plaintiff or plaintiff's partnership interest cannot be excepted from debtor's discharge because he did not act with malice. Debtor claims that his actions were justified in order to protect the partnership following plaintiff's alleged threat on October 30, 1992, to shut down the partnership.

As stated previously, malice need not be proven by direct evidence but can be inferred from the circumstances. The evidence is clear that the relationship between the partners was strained in 1992 and grew worse as the year went on. Debtor's notice of withdrawal led to a heated argument between the partners on October 30, 1992. The fact that debtor removed partnership property from the partnership office within 24 hours of this argument gives rise to the inference that debtor acted out of anger towards plaintiff and with intent to exclude plaintiff from the firm's affairs. Regardless of whether plaintiff threatened to shut down the partnership (which was denied by plaintiff in a November 4, 1992, letter from plaintiff's attorney to debtor), the court cannot find debtor's actions justified. The totality of his conduct shows that debtor intended to exclude plaintiff from every aspect of the partnership, from soliciting clients for his own benefit to performing work for partnership clients to

control over the partnership finances. It is highly doubtful that such pervasive action over an extended period was necessary to protect the partnership from plaintiff's alleged threat.

These facts, coupled with the fact that debtor refused to return any of the property or funds of the partnership after plaintiff's repeated demands, leads the court to conclude that debtor acted both willfully and maliciously toward plaintiff and plaintiff's partnership interest.

■ The next question concerns plaintiff's damages. Plaintiff alleges he was damaged by debtor's refusal to return partnership personal property after the termination of the partnership and the cash draws taken in November and December 1992. He also claims substantial injury to the value of his partnership interest.

With respect to the personal property and draws, debtor argues he was justified in paying the draws to himself during November and December to the exclusion of plaintiff because he needed these funds to pay his personal living expenses. Without access to these funds, he would have been forced to work elsewhere which would have led to even further injury to the partnership. By using these funds to pay his own expenses, he was able to continue working for the partnership, therefore producing partnership revenue.

Regardless of debtor's need for the funds, which is beside the point, debtor was fully aware that plaintiff was entitled to one half of these funds when he paid draws to himself. Debtor admitted as much in his November 2, 1992, letter in which he asked plaintiff to pay certain partnership bills and then distribute the remaining partnership funds equally to the partners. Debtor also knew that plaintiff did not have access to the John S. Chwat Escrow Account and that plaintiff was unable to pay himself the corresponding draws directly.

The court finds that debtor's payment of partnership funds to himself to the exclusion of plaintiff was willful and malicious and that one half of the draws or $4,175.00 represent damages to plaintiff. Likewise, debtor's refusal to return the partnership personal

property resulted in a willful and malicious injury to plaintiff. The court previously found that plaintiff's one half interest in this property had a value of $1,040.00.

■ The more difficult damage issue arises under plaintiff's claim of injuries to his partnership interest resulting from debtor's willful and malicious conduct. Plaintiff testified that on September 30, 1992, his partnership interest in Chwat Weigend Associates had a value of $137,500.00. He calculated this figure by adding his estimated value of his partnership interest or equity of $40,-375.00 to his estimated value of his share of partnership goodwill, $97,500.00. Plaintiff determined the goodwill value of the partnership based upon past earnings of the partnership and projected future income.

The validity of plaintiff's estimated value is highly doubtful, as is his valuation date. At the outset, it must be noted that plaintiff is not an appraiser or an expert at valuing small businesses. Plaintiff testified that he used a date of September 30, 1992, because this was the latest time on which he had accurate financial information concerning the partnership. Regardless of the accuracy of plaintiff's calculations, this date is not an appropriate point to value the partnership since it represents no definitive point in the parties' dispute. Rather, I find the partnership should be valued no earlier than October 31, 1992, when debtor removed property from the partnership office and began his effort to take control. This date also follows debtor's notice of withdrawal and allows the court to consider the consequences of debtor's withdrawal on the value of the partnership.[6]

According to plaintiff's testimony, the "investment value" of his partnership interest represents his equity. To determine this value, plaintiff relied on a September 30, 1992, balance sheet prepared by him (Ex. A). According to the balance sheet, on September 30, 1992, the partnership had assets of $31,120.40 and liabilities of $52,313.64. The negative equity represented by these figures would have been even worse (and more accu-

rate) if plaintiff had included the partnership's monthly liability under its lease of $8,000.00. The value of the partnership would have been further reduced if the balance sheet had not included as an asset (notes receivable) an uncollectible debt owed by a former employee. Finally, plaintiff has recalculated his capital in the partnership by reclassifying as equity the debt owed to him by the partnership pursuant to the September 30, 1992, promissory note.

In summary, plaintiff's evidence falls far short of demonstrating that in late 1992 his partnership interest or equity had any significant value capable of being damaged by debtor's actions or that at any earlier time debtor willfully and maliciously caused plaintiff a monetary damage to his partnership interest.

Plaintiff's valuation of his partnership goodwill interest at $97,500.00, based on projected future earnings of the partnership, is also quite unrealistic. Plaintiff testified that he determined goodwill by averaging partnership earnings over the years 1988 thru 1992 and then adjusting this average to take other factors into consideration. This historical analysis is plainly inappropriate as it fails to reflect the true state of the partnership in the fall of 1992. As the court has found, during 1991 and 1992 the partnership lost several important clients such as the National Licensed Beverage Association, the National Exchange Carriers Association and Eduardo Cojuangco. In addition, it is important to point out that none of the remaining clients were obligated to the partnership beyond 1992, rendering future income from these clients uncertain. At the same time, the partnership had doubled its rent and had failed to obtain new clients to replace those which had left.

The partnership's dire straits in the fall of 1992 is further evidenced by the fact that its last employee was let go on July 24, 1992. Perhaps the most indicative evidence that the partnership was nearing an end can be found in plaintiff's own decision to diversify his

---

**6.** I find that it is not necessary to value the partnership as of a specific date as long as the impact of debtor's actions during the last quarter of 1992 are considered along with the impact of debtor's withdrawal from the partnership.

income by opening a game store in Chantilly, Virginia.

Plaintiff's determination of goodwill also failed to address the impact of debtor's impending withdrawal from the partnership. The partnership agreement did not contain a non compete clause, and debtor was free to compete against the partnership as soon as he withdrew. In fact, debtor had formed his own company for this very purpose and was ready to operate on January 1, 1993. The evidence makes it clear that competition from the debtor would be devastating to the partnership, since it was debtor who had a reputation as a lobbyist and who had formed a working relationship with the clients. Debtor's influence with the partnership clients was demonstrated when, following the notice of his withdrawal, he sent competing bills to partnership clients and requested that they pay him directly. A large majority of the clients did as requested, and debtor testified that in his opinion, only one partnership client would have remained with plaintiff; the rest would have followed debtor. In addition, debtor testified that it would cost the partnership approximately $65,000.00 a year to hire a full time lobbyist, a cost well beyond the ability of the partnership to pay. I do not doubt this testimony.

Although debtor's actions during the latter part of 1992 may have damaged plaintiff's partnership interest (predominantly because they interfered with plaintiff's right to manage the partnership), this injury was negligible when compared to the effect that debtor's withdrawal was to have on the partnership. Debtor's withdrawal essentially left a lobbying firm without a lobbyist and with no clients. As a result, the court finds that by the end of 1992, any goodwill value of the partnership had been negated by debtor's withdrawal from the partnership, something he had every right to do.

In conclusion, even though debtor's conduct towards plaintiff may be considered reprehensible, any damage award must be severely limited due to the fact that by the last months of 1992 plaintiff's partnership interest had become worthless due to the steady decline of the partnership and the impact that debtor's withdrawal and future competi-

tion would have. Therefore, under § 523(a)(6) the court will except from debtor's discharge only the specific damages stemming from debtor's refusal to return to plaintiff one half the value of the partnership personal property following the effective date of his withdrawal ($1,040.00) and debtor's failure to remit one half of the partnership draws paid to himself during November and December 1992 ($4,175.00).

A separate order will be entered excepting the sum of $5,215.00 from debtor's discharge and granting plaintiff judgment. Under § 523(a)(4) the amount of $1,040.00 is excepted based upon debtor's embezzlement of one half the value of partnership personal property. Excepted from discharge pursuant to § 523(a)(6) are the value of the personal property plus $4,175.00 representing plaintiff's share of draws taken by debtor during November and December 1992.