In re Gregory E. DAVIS, Janet
K. Davis, Debtors.

Charles R. Johnson, Sr., Plaintiff,

v.

Gregory E. Davis, Defendant.

Bankruptcy No. 99–38108–T.
Adversary No. 00–3038–T.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 8, 2001.

Paula S. Beran, Lynn Lewis Tavenner, Troy Savenko, LeClair Ryan, P.C., Richmond, VA, for Charles S. Johnson, Sr.

James DeWees, David Tepper, James DeWees Law Firm, Richmond, VA, for Gregory E. Davis.

## *MEMORANDUM OPINION*

DOUGLAS O. TICE, Jr., Chief Judge.

Trial was held on October 13, 2000, on plaintiff Charles R. Johnson, Sr.'s complaint for determination of dischargeability of debt under 11 U.S.C. § 523(a)(4) and

(a)(6). At the conclusion of trial, the court ruled in favor of plaintiff on the count under § 523(a)(6), finding the factual record adequate to support a ruling that defendant/debtor Gregory E. Davis had willfully and maliciously injured plaintiff's collateral. The § 523(a)(4) count was taken under advisement. Counsel for plaintiff was instructed to prepare proposed findings of fact and conclusions of law as to both counts, including a specific enumeration of damages requested.[1]

Counsel for plaintiff submitted the requested proposed findings of fact and conclusions of law on November 28, 2000. Counsel for debtor filed alternative proposed findings on December 26, 2000.

For reasons stated in this opinion, judgment will be entered against debtor under both counts.

## I. *Findings of Fact.*

In 1989, debtor, plaintiff Charles R. Johnson, Sr., and his son, Charles R. Johnson, Jr., organized Suburban Auto Sales, Inc. (SAS) to engage in a retail used automobile business. In 1991, plaintiff and his son organized Suburban Auto Bodyworks, Inc. (SAB), which repaired vehicles for SAS. Plaintiff was the owner of the real estate and improvements where SAS and SAB conducted business at 25115 Airport Street, Petersburg, Virginia.

In 1992, plaintiff sold his ownership interest in SAS to his son and debtor. Plaintiff's son and debtor each purchased equal shares; however, debtor ultimately failed to pay all amounts due and owing under the sale. SAS and SAB continued to operate in the premises owned by plaintiff, for which he charged no rent.

After plaintiff sold his ownership interest in SAS, he continued to engage in the used car business individually. He did this by purchasing vehicles at auction for resale. Plaintiff financed these purchases, along with necessary repairs, out of his own funds. Because he did not hold a dealer's license, the automobiles he purchased were titled in the name of SAS, and they were sold from the SAS lot by SAS personnel or plaintiff.

Plaintiff maintained possession of the certificates of title for his vehicle purchases in a file cabinet located in the SAS sales office. Plaintiff had unrestricted access to this office and to his file cabinet of titles. It was plaintiff's practice to release his titles only when he had received full payment following the sale of a vehicle.

Debtor agreed to the arrangement between SAS and plaintiff whereby plaintiff purchased automobiles for his own account and had titles issued in the name of SAS. Debtor and all SAS personnel knew that the vehicles and the titles were property of plaintiff.

Also, after plaintiff sold his ownership interest in SAS, plaintiff personally guaranteed a working capital loan in the amount of $40,000.00 from the Bank of Southside Virginia (Southside Bank or the bank) to SAS.

The arrangement between plaintiff, SAS, and debtor proceeded without incident for several years until July 1996, when without corporate authority and the knowledge or consent of plaintiff or his son, debtor granted Southside Bank a blanket lien on all assets of SAS. This lien also covered the vehicles that had been purchased by plaintiff. Subsequently, in late 1997 or early 1998, without permission and corporate authority, debtor took the certificates of title to approximately forty-

---

**1.** Because the court did not make extensive factual findings at the conclusion of the lengthy trial, this memorandum opinion serves to supplement the court's bench ruling on the count under § 523(a)(6).

three of plaintiff's automobiles to Southside Bank. (Vehicles reflected in Exhibits 7–83).

When plaintiff learned of the transfers and confronted debtor concerning his unauthorized removal of plaintiff's titles, debtor stated that he had removed the titles for the vehicles from the SAS office to Southside Bank for safekeeping. Debtor also stated that the vehicles were not to be used as collateral to secure any loans from the bank. On several occasions, plaintiff demanded the return of certain of the titles from debtor, and debtor returned some of the titles to plaintiff in response to these demands.

On several occasions during 1998, debtor reassured plaintiff and his wife that the vehicles at issue were not being used to secure any bank loans. However, during this same period, notwithstanding the fact that SAS was experiencing severe financial difficulties, debtor frequently failed to appear at SAS offices but still continued to draw a salary.

SAS salespersons viewed the vehicles in question as belonging to plaintiff and referred to them in conversations with SAS employees as "Chuck's vehicles." In fact, all inquiries about these vehicles were directed to plaintiff. In the instance that plaintiff was not on the SAS premises, the salespersons would talk with debtor, who in turn would obtain the requisite approval from plaintiff.

In November 1998, debtor, without knowledge or consent on the part of plaintiff's son, obtained a line of credit for $200,000.00 in the name of SAS from Southside Bank. Under this credit facility, SAS provided the bank with VIN numbers, makes and years of particular vehicles, and the bank deposited a determined percentage of the vehicles' value in SAS' operating account.

In connection with this financing, debtor provided or directed his spouse, co-debtor Janet Davis, to provide to the bank the VIN number, make and year of the vehicles even though debtor knew these were plaintiff's vehicles. Debtor thus encumbered plaintiff's vehicles at a time when SAS was experiencing financial problems which made it unlikely that SAS could fully repay its bank loans. Debtor also knew that plaintiff believed that he owned or possessed a lien against the vehicles in the amount of the full payment and repair amounts, if applicable. Debtor continually assured plaintiff that debtor had not injured or impaired plaintiff's interests in the vehicles to any extent. Plaintiff accepted these representations made by debtor.

In November or early December 1998, plaintiff learned that debtor had pledged, without corporate authority, his vehicles to Southside Bank as collateral for loans made to SAS, from which proceeds were utilized to pay debtor's salary among other mounting expenses for the failing enterprise. Upon being confronted with inquiries about pledging the vehicles to the bank as collateral for a line of credit, debtor broke down to plaintiff, apologized and asked that plaintiff not take any criminal action against him. A few days after debtor made the apologies and pleas to plaintiff and without plaintiff's knowledge, debtor again provided the bank with VIN numbers, make and year of fourteen additional vehicles and again obtained additional loan advances to pay debtor's salary.

In January 1999, plaintiff's son[2] sold his ownership interest in SAS to debtor. Also in 1991, Southside Bank, which had declared its loan in default, exercised options

---

**2.** In August 1999, plaintiff's son died due to a heart attack.

under the various SAS notes and security agreements. In June 1999, the bank made demand upon plaintiff under his personal guaranty and also asserted a security interest in plaintiff's vehicles. In response, plaintiff disputed the bank's assertions. Thereafter, plaintiff and the bank settled their disputes. The settlement agreement provided for: (i) payment by plaintiff to the bank in the amount of $115,000.00; (ii) the bank's sale of the vehicles to plaintiff or various entities owned by him; (iii) plaintiff's release of his interests in other vehicles; and (iv) plaintiff's release from his personal guaranty.

Plaintiff's total costs for purchase and repair of the 43 encumbered vehicles owned by him were $117,805.84. As a result of debtor's and SAS' unauthorized transfers of plaintiff's vehicles as collateral for loans to SAS, plaintiff was damaged in an amount of not less than $115,000.00, the amount he paid for the return of his vehicles.

## II. *Position of the Parties.*

### A. *Plaintiff.*

On March 13, 2000, plaintiff filed a complaint for determination of dischargeability of debt against debtor under 11 U.S.C. § 523(a)(4) and (a)(6). Nondischargeable damages are sought in the amount of $117,805.84 based upon debtor's unauthorized transfer of automobile titles which were property of debtor.

### B. *Defendant.*

Counsel for debtor argues that there are two principal issues: (1) the ownership of the disputed certificates of title; and (2) intent of debtor when plaintiff's vehicles were sold, bank financing was obtained or titles removed and transferred.

(1) Debtor asserts that landlord-tenant law should be considered by the court because plaintiff owned the real estate, improvements, and car lots on which debtor's dealership SAS conducted its business; also when plaintiff purchased vehicles, he had possession of them until the point when he brought them to the premises, where possession was transferred to SAS. Plaintiff thereby surrendered whatever possessory lien he may have had.

As to § 523(a)(6), willful and malicious injury, debtor maintains that a finding against him under subsection (a)(6) is possible only if there was a property interest held by plaintiff. At most, according to debtor, plaintiff holds an unsecured claim against vehicles because plaintiff did not otherwise have a legally enforceable property interest.

(2) Regarding intent, debtor maintains that every time a vehicle was sold through SAS, plaintiff promptly received payment. Debtor maintains that there is no evidence in the record that SAS ever failed to pay SAB for repairs or plaintiff for payment of the vehicles and further asserts that there was a policy in place that ensured regular payment to plaintiffs for vehicles as a matter of business in the ordinary course. Finally, debtor points to the fact that over the history of business between debtor and plaintiff, hundreds of vehicles were sold, so that the present dispute of approximately thirty vehicles is not representative of the normal course of dealing, nor sufficient to establish contrary intent under subsection (a)(6).

## III. *Discussion and Conclusions of Law.*

### A. *Summary of the Facts.*

The court has made extensive findings of fact. However, a summary of the essentials will be helpful to the analysis of the issues.

In 1989, plaintiff Charles R. Johnson, Sr., along with his son and debtor Gregory E. Davis organized a corporation, SAS, to engage in the used automobile sales business. In 1992, plaintiff sold his interest in

this corporate business to debtor and plaintiff's son. After plaintiff sold his interest in the business, SAS continued to operate in its former premises which were owned by plaintiff. SAS financed its continuing operations with a loan from Bank of Southside Virginia which was guaranteed by plaintiff. Also, plaintiff continued to purchase vehicles for resale for his own account. He paid or financed the purchase of the vehicles and also paid for necessary repairs for resale purposes. Because he was not a licensed dealer, the vehicles were titled in the name of SAS. Notwithstanding the titling of vehicles purchased by plaintiff in the name of SAS, debtor knew and agreed that these vehicles were property of plaintiff; the titles were maintained in a file cabinet in the SAS sales office and were accessible to debtor. Plaintiff received the proceeds of sales of his vehicles.

Beginning in 1996, debtor, without plaintiff's knowledge or permission, caused SAS to borrow additional operating funds using plaintiff's vehicles as collateral. During 1997 and 1998, debtor caused SAS to grant a security interest in 43 of plaintiff's vehicles to Southside Bank. These automobiles were property of plaintiff; the transfers by debtor were without authority from plaintiff. Plaintiff's purchase and repair costs for these vehicles was in the total amount of $117,805.84. After the discovery of debtor's transfers and when SAS was unable to repay the loans, the bank threatened to liquidate its collateral, including plaintiff's vehicles. Plaintiff reached a settlement under which he paid the bank the sum of $115,000.00 in exchange for the return of the vehicles and his release from the earlier loan guaranty.

**B.** *Willful and Malicious Injury to Property Exceptions to Discharge under § 523(a)(6).*

■ Section 523(a)(6) excepts from discharge "an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." Under subsection (a)(6), the injury to property must have been both willful *and* malicious, or "wrongful and without just cause or excuse." *See Branch Banking and Trust Co. v. Powers (In re Powers)*, 227 B.R. 73, 77 (Bankr. E.D.Va.1998); *see also Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164–65 (11th Cir.1995); *DeBellis v. Maula (In re Maula)*, 166 B.R. 49, 52 (Bankr.M.D.Pa.1994).

■ The burden of proof rests with plaintiff to establish by a preponderance of the evidence that the debt owed to him by debtor is excepted from discharge under § 523(a). *See Grogan v. Garner*, 498 U.S. 279, 286–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**1.** *Willfulness.*

■ An injury is willful when the court can determine that a debtor intended the act and by his or her conduct intended to cause injury. *See Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Fourth Circuit's definition of willful for the purposes of determinations of nondischargeability under § 523(a)(6) is "deliberate" or "intentional." *First Nat'l Bank v. Stanley (In re Stanley)*, 66 F.3d 664, 667 (4th Cir.1995) (citation omitted); *Kaufman v. Vamvakaris (In re Vamvakaris)*, 197 B.R. 228, 231 (Bankr.E.D.Va.1996) (citations omitted).

In *Kawaauhau v. Geiger,* the Supreme Court held that a "willful" injury under § 523(a)(6) required the debtor to have committed an intentional tort. The Court effectively overruled previous decisions of some courts that had recognized reckless or negligent injury as willful and malicious. *See Kawaauhau,* 523 U.S. at 61–63, 118 S.Ct. 974; *see also 4 Collier on Bankrupt-*

*cy* ¶ 523.12[1] (Lawrence P. King ed., 15th ed. rev.2000). An issue not clearly answered by *Geiger* is whether a debtor must have specifically intended to cause injury or whether the debtor's intentional commission of a wrongful act which necessarily leads to injury is sufficient to except the debt from discharge. *See id. Collier* suggests that the latter approach is appropriate under the U.S. Supreme Court holding in *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916). *See* 4 *Collier on Bankruptcy* at ¶ 523.12[1].

■ The majority of case decisions after *Geiger* have held that the test for willfulness under § 523(a)(6) is met by an intentional act (tort) that is "...substantially certain to result in injury...." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir.1998)³; *see also Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 462–63 (6th Cir.1999); *Harry Ritchie's Jewelers, Inc. v. Chlebowski (In re Chlebowski)*, 246 B.R. 639, 643 (Bankr. D.Or.2000); *Mercantile Bank v. Speers (In re Speers)*, 244 B.R. 142, 144–45 (Bankr.E.D.Ark.2000); *Fidelity Financial Serv. v. Cox (In re Cox)*, 243 B.R. 713, 718–19 (Bankr.N.D.Ill.2000).

■ In this case, debtor approached plaintiff in tears apologizing for his prior actions and pleading that plaintiff not initiate any criminal prosecution against him. Debtor's repeated reassurances to plaintiff, plaintiff's son, and plaintiff's wife that debtor was doing nothing to harm plaintiff's interests in the vehicles, nor the vehicles themselves, as well as debtor's communications with others employed by SAS

that all inquiries concerning the vehicles should be referred to plaintiff likewise strongly support the court's finding that debtor knew of plaintiff's interests in the vehicles and intended to deprive plaintiff of his property by transferring the vehicles to the bank. Debtor obviously knew that his transfer of the titles was wrongful and that given SAS' inability to repay its obligations plaintiff would be financially harmed by the loss of his property.

In summary, the court finds that debtor committed an intentional tort and that he intended to injure plaintiff by permanently depriving plaintiff of his property. Even if debtor did not subjectively intend to injure plaintiff, his intentional act of transferring plaintiff's property under the circumstances was "substantially certain" to injure plaintiff. Debtor's actions constituted willful injury within the meaning of § 523(a)(6).

### 2. *Malice.*

■ Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *See In re Stanley*, 66 F.3d at 667, *citing St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008–09 (4th Cir.1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. *See In re Powers*, 227 B.R. at 73.

■ Debtor's subjective mind set is central to the inquiry as to whether debtor

---

**3.** In *Miller,* the Fifth Circuit observed that the Supreme Court had left three possible "readings" to a finding of willfulness under § 523(a)(6):

> The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to

inflict injury. We hold that the label "intentional tort" is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6). 156 F.3d at 603.

acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. *See St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under ... § 523(a)(6)."); *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 625 (4th Cir.1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley*, 66 F.3d at 667.

Plaintiff successfully demonstrated to the court that debtor acted with malice towards the vehicles and their titles. Debtor repeatedly exercised dominion and control over the titles for the vehicles at issue and pledged the vehicles as collateral to secure bank lines of credit. Plaintiff's actions satisfied the malice element of § 523(a)(6).

### 3. *Summary.*

As the court has previously ruled from the bench and further discussed above in the case law, debtor's conduct satisfied the statutory requirements for a determination of nondischargeability based upon debtor's willful and malicious injury to plaintiff's vehicles.[4] Plaintiff's damages, as previously determined, will be excepted from debtor's discharge.

### C. *Embezzlement and Larceny Exceptions to Discharge under § 523(a)(4).*

#### 1. *Embezzlement.*

■■■■■ Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Id.; see also Weigend v. Chwat (In re Chwat)*, 203 B.R. 242, 248 (Bankr.E.D.Va.1996); *Hyman Wholesale Corp. v. Allman (In re Allman)*, 147 B.R. 122, 125 (Bankr.E.D.Va.1992), *citing Virginia Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901 (Bankr.E.D.Va.1985); *Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr. E.D.Va.1992). Embezzlement is distinguishable from larceny because the original acquisition of the property was lawful, or at least with the consent of the owner, unlike with larceny where there is a requirement that felonious intent exist at the time of the taking. *See Werner v. Hofmann (In re Hofmann)*, 144 B.R. 459, 464 (Bankr.D.N.D.1992), *aff'd*, 5 F.3d 1170 (8th Cir.1993); *see also Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 73–74 (Bankr. S.D.N.Y.1993), *aff'd*, 152 F.3d 919 (2d Cir. 1998).

■■■■■ An embezzlement claim under federal common law requires a showing by the plaintiff by preponderance of the evidence the following two elements: (1) the person was lawfully entrusted with property or property lawfully came into the hands of that person, and (2) the property was fraudulently appropriated. *See ProSports Mgmt. v. Jacobs (In re Jacobs)*, 243 B.R. 836, 844 (Bankr.M.D.Fla.2000); *In re Chwat*, 203 B.R. at 248; *In re Allman*, 147 B.R. at 125.

■■■■■ Fraudulent intent may be determined from the surrounding facts and circumstances of the case. *See In re Chwat*, 203 B.R. at 249; *In re Allman*, 147 B.R. at 125, *citing Moonan v. Bevilacqua (In re Bevilacqua)*, 53 B.R. 331, 334 (Bankr.

---

**4.** The court finds the arguments of debtor's counsel on this count to be without merit.

S.D.N.Y.1985); *In re Blanton,* 149 B.R. at 394. For instance, this court, in the *Allman* case found that debtor's misappropriation of vehicles and their certificates of title that were property of others, as well as debtor's false assurances to others about his conduct were sufficient to "... give rise to an inference of fraudulent intent." 147 B.R. at 125–26.

Here, the evidence at trial established (1) that plaintiff had an ownership interest in the titles and vehicles central to this proceeding; (2) that debtor had actual knowledge of and consented to plaintiff's interests; (3) that plaintiff owned and operated the premises in which the titles were stored and had daily control over the maintenance and storage of these titles; and (4) that debtor and his employees understood the corporate policy as established by plaintiff of not releasing the titles to potential vehicle purchasers until SAS received full payment.

Plaintiff thus entrusted the titles to debtor with the understanding that debtor would protect plaintiff's interests in the titles and actual vehicles. Yet, on two separate occasions, debtor fraudulently appropriated the vehicles by pledging them as collateral to obtain financing from Southside Bank. When plaintiff and his wife inquired of debtor on several occasions about the location of the titles and whether the vehicles were being used as collateral for financing debtor's businesses and expenses, debtor repeatedly denied this fact and said that he removed the titles to Southside Bank for safekeeping. Sometime later, when plaintiff ultimately confronted debtor about using the vehicles as collateral for bank loans, debtor broke down, pled for forgiveness and requested that plaintiff not take any legal action against debtor. Later, debtor pledged fourteen more vehicles to the bank to obtain additional financing for his failing businesses and salary advances.

Debtor benefitted from use of the vehicles as collateral for obtaining financing. For each instance when debtor provided titles, the bank advanced additional sums to debtor. Debtor continued to draw a full salary even when the dealership was experiencing severe financial difficulties, and debtor was aware of these financial difficulties when he misappropriated what limited assets existed—the vehicles and titles. Consequently, debtor's actions constituted embezzlement under § 523(a)(4).

### 2. *Larceny.*

Larceny is the "fraudulent or wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner." 4 *Collier on Bankruptcy* at ¶ 523.10[2]. Bankruptcy courts are not bound by state law definitions of larceny but may instead follow federal common law that defines larceny as the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Clarendon Nat'l Ins. Co. v. Barrett (In re Barrett),* 156 B.R. 529, 533 (Bankr.N.D.Tex.1993), *aff'd,* 1999 WL 184117 (N.D.Tex. Mar. 26, 1999) (citation omitted); *In re Jacobs,* 243 B.R. at 845.

In this case, debtor unlawfully utilized and converted plaintiff's titles and vehicles without plaintiff's permission, consent, or the requisite corporate authority when he twice pledged vehicles to Southside Bank in exchange for financing. Plaintiff suffered as a result of this felonious conversion because the value of his titles and vehicles was impaired and encumbered by debtor's actions. Debtor's actions were intentional and done while debtor had full awareness and knowledge

of plaintiff's interests. These actions constituted larceny under § 523(a)(4).

### 3. *Damages.*

When collateral is converted as it was here, the usual measure of an award of damages is the retail value of the collateral at the time the conversion occurred, not to exceed the balance owing on the account secured by the collateral. *See In re Chlebowski*, 246 B.R. at 645, *citing Fidelity Fin. Serv. v. Cox (In re Cox)*, 243 B.R. 713, 720 (Bankr.N.D.Ill.2000).

The record here does not establish the retail value of plaintiff's vehicles when they were converted by debtor. The parties have stipulated that plaintiff's total investment in the vehicles was $117,805.84. Plaintiff paid Southside Bank the sum of $115,000.00 to recover his vehicles. This cash outlay by plaintiff was a direct result of debtor's wrongful conduct, and the court fixes plaintiff's damages in this amount.

A separate order will be entered.