B. W. BLOUNT, *Plaintiff in Error*, v. E. H. TOMLINSON, *Defendant in Error*.

1. Where a real estate broker or dealer agrees by parol with a known agent of a known principal to obtain a purchaser for the real estate of the latter and a sale is effected, the legal presumption is if commissions on the sale are agreed to be paid the broker, that the principal is liable to pay the commissions rather than the agent of such principal, and this presumption will prevail unless it is made to appear by the evidence that credit for the commissions was given to the agent; and in a suit by the broker or dealer against the agent to recover the commissions the burden of proof rests upon such broker or dealer, of showing that the agent agreed to be personally responsible for such commissions. But where the contract or dealings between the parties are such as prima facie bind the agent, the burden of proof that in fact they bound the principal is upon the agent.

2. A party dealing with an agent is not at liberty to fix the terms upon which he will deal with such agent without regard to the consent or promise of the latter.

This case was decided by Division B.

Writ of Error to the Circuit Court for Hillsborough County.

The facts in the case are stated in the opinion of the court.

*D. C. McMullen,* for Plaintiff in Error;

*MacFarlane & Davis* and *Richard P. Marks,* for Defendant in Error.

HOCKER, J.—This case is here on writ of error from a judgment of the Circuit Court of Hillsborough County in favor of E. H. Tomlinson against B. W. Blount for $4,300 and costs.

In March, 1906, the Peninsular Naval Stores Company, a Mr. Stucky and a Mr. Henderson owned a tract of 24,000 acres of land near Umatilla which is in Lake County, Florida, their respective interests being one-third each. Mr. B. W. Blount, the plaintiff in error, was the president and manager of the Peninsular Naval Stores Company. On the 19th day of March, 1906, the defendant in error E. H. Tomlinson wrote the following letter to B. W. Blount:

"Jacksonville, Fla., 3-19-'06.

B. W. Blount,

      Tampa, Fla.

Dear Sir:—

I have a party to whom I can sell the Sawmill timber on the 2,400 acres near Umatilla, and belonging to you and Mr. Henderson. Mr. Henderson said you wanted to retain the land. I had Mr. Henderson when here to meet Mr. Page (Cooney's man) and he gave a price of $3 net, this was two months ago. I wish you would give me your very best price and let me know what commission you can pay. I believe I can sell it at $3.25 and reserve the land. I usually charge 5 per cent *do not speculate* on property placed with me for sale there-

fore I want your best price, and would like it with a map of the tract as early this week as you can give it The tract I placed before you and Mr. Muller is cheap. Yours truly,"

On the 21st Blount wrote the following letter to Tomlinson:

"Mar. 21, 1906.

Mr. E. H. Tomlinson,
         Jacksonville, Fla.

Dear Sir:—

I have yours relative to the Umatilla proposition. I am referring your letter to Mr. E. K. Nelson of Ocala for reply, who will send you map, prices, etc.

Respectfully,

BWB                                     B. W. Blount."

On the 22nd of March, 1906, Mr. Nelson sent the following letter to Tomlinson in reply:

"Ocala, Fla. 3-22-'06.

Mr. E. H. Tomlinson,
         Jacksonville, Fla.

Dear Sir:—

Yours of the 19th to Mr. Blount referred to me to-day. We have the exclusive handling of the Umatilla Timber and would be glad to sell you same; the price of this timber is $3.50 per acre for the mill timber alone, does not carry any land or turpentine rights. There is 5 per cent commissions at this price, which we will divide equally with any one that will furnish a purchaser. If you have a party ready to do business we will be glad to take it up with you.

Yours truly,

The Blount Real Estate Company,
         Per E. K. Nelson, Secy and Treas."

Mr. Tomlinson says in his testimony: "I consider that Mr. Blount's letter is the first that placed the prop-

erty in my hands. This was the first letter I got from
Mr. Nelson in reference to the matter. This corres-
pondence so far constitutes the placing of this property
in my hands for sale but not exclusively because my cor-
respondence continued with Mr. Blount." Mr. Tomlin-
son further says: "I do not claim these two letters I
have introduced in evidence as the basis of my right to
sell this property exclusively, because as the trade pro-
gressed changes developed. I do not base my claim on
this correspondence, but there are subsequent changes
that entirely changed the character of the contract. This
original contract was for the timber only; afterwards
we changed the contract and entered into negotiations
for the timber and turpentine privileges, a sale of every-
thing connected with the place; these negotiations were
entered into by me with Mr. Blount and his agent Mr.
Nelson, who was supposed to carry out his principal's
instructions." He further says: "I was informed that
this property belonged and was owned by Mr. Blount,
Mr. Henderson and Mr. Stucky; I understood that Mr.
Henderson and Mr. Stucky were interested in the prop-
erty along towards the last of the trade; I did not know
it at the beginning." He further says that about six
weeks after the negotiations began he discovered from
correspondence that a Mr. Lester was representing Mr.
Blount. All the negotiations about the sale of the tur-
pentine and timber privileges fell through on the prices
of $3.00 and $3.50 per acre, but finally the whole 24,-
000 acres were sold to a Mr. McGehee for $100,000.
Mr. Tomlinson says he first got these figures from Mr.
Lester and that he presented them to Mr. Blount in front
of the Law Exchange in Jacksonville, and Mr. Blount
said that he would let the property go at $113,000, and
pay him, Tomlinson, 5 per cent. commissions. This he
says was the beginning of the new deal which terminated

in the sale to McGehee.  Mr. Tomlinson testifies that he agreed to give Lester 1-4 of his commissions of 5 per cent; that he thought Lester was a good friend of Blount's and he, (Tomlinson) thought Lester could assist him in getting Blount to comply with his proposition to sell the turpentine privileges.

It is impossible to give any reasonably brief analysis of the long and confusing explanations of Mr. Tomlinson or of the other witnesses of the various letters and conversations which were had between the parties during these negotiations.  Mr. Tomlinson admits that "as a matter of fact I knew before this deal was consummated that Mr. Stucky and Mr. Henderson were interested in this property, this Umatilla tract—notwithstanding I was dealing with Mr. Blount as owner.  I knew and understood that Mr. Stucky and Mr. Henderson were also owners in it, but I was dealing with Mr. Blount as I understood him to be the owner and controller, that is that he had the management and control of the property."  He testifies that "Mr. Blount promised me personally to give me five thousand dollars' a commission of 5 per cent on $100,000.

Mr. McGehee testifies in substance that he purchased the Umatilla tract through Mr. Tomlinson's Real Estate Agency in Jacksonville; that after various negotiations he submitted the $100,000 proposition to Mr. Blount in Tampa.  He does not think any one was present but himself, Tomlinson and Blount; that *Blount said that he would have to get into communication with Mr. Nelson, but he afterwards closed the deal in Ocala on that basis.*

Mr. Blount testifies that he never owned the Umatilla tract of land; that at the time the deal with McGehee was made, the property was owned by Stucky, Henderson and the Peninsular Naval Stores Company; that he

was president and manager of the latter company and that the only way he became connected with the deal was as such president; that the matter of selling the property was taken up with Mr. Lester; that Lester represented him in dealing with Tomlinson; that he never put the property in Tomlinson's hands for sale, but did place it in Lester's, and when it was sold he paid Lester the commissions according to the agreement with him; that he represented all the owners in selling the property; that he never placed the property in Tomlinson's hands and never agreed to pay him a commission; that he knew Lester and Tomlinson were handling this deal together; that he never had a conversation with Tomlinson as to what his share of the commission should be; that he put the property in Lester's hands for sale; that Tomlinson was representing the buyer and Lester the sellers; "that is what I thought, that he wrote to Tomlinson because Tomlinson wrote to him."

Mr. Lester testifies in substance that he effected the sale through Tomlinson and was entitled to the 5 per cent commission, which was to be divided in the proportion of 1-3 between himself, Tomlinson and Mr. Blount. The latter says this was for the company of which he was president.

Many letters and telegrams passed between the parties, but they do not shed any particular light upon the controverted fact whether Lester or Tomlinson was entitled to the 5 per cent commission. They tend to show the relation between Tomlinson and Lester immediately before the sale was concluded in July, 1906. For example the following telegrams and letters:

"Jacksonville, Fla. May 14, 1906.

P. R. Lester, Ocala, Fla.

Arrange with Blount for sale to McGehee as we talked.

E. H. Tomlinson."

"Jacksonville, Fla. June 25-'06.

P. R. Lester, Ocala, Fla.

Have Blount meet us Ocala Wednesday noon—answer quick.          E. H. Tomlinson."

"Jacksonville, Fla. 5-9-'06.

P. R. Lester, Esqr.

    Ocala, Fla.

Dear Sir :—

I sent my man the plat of the 27000 and I will be glad for you to make the arrangement with Mr. Blount you and I were talking about. My party may be on the land now, so don't lose any time in letting me know. I want to write him what I can do.   Yours truly,

E. H. Tomlinson."

In a letter of Tomlinson's to Lester dated Jacksonville, Fla. 6-21-'06, he says: "I have asked Blount to wire and meet McGehee Monday or Tuesday as they may agree."

There are several other letters from Tomlinson to Lester written in June, in which he is endeavoring to bring about the meeting between Blount and McGehee, through Lester. The testimony it seems to us is conflicting as to whether Blount was handling this property through Lester as his sole agent or through Tomlinson as his sole agent or through Lester and Tomlinson together. It is clear, however, that Blount did not own the property himself, and that he was simply representing the owners in the transaction. The evidence shows that Tomlinson knew that Blount was not the owner before the sale was consummated. Blount positively denies that he ever promised to pay Tomlinson commissions for selling the property, and alleges that he put the property in Lester's hands for sale, and not in Tomlinson's. He says he thought they were acting together. Lester says the property was in his hands for sale and he promised

Tomlinson one-fourth of the commissions. Tomlinson says he had the sale of the property and promised Lester one-fourth of the commissions. In this state of the evidence the judge charged the jury: "When a party deals with the known agent of a known principal and deals with the agent on his own personal responsibility, he has the right to ignore the principal and hold the agent responsible for the payment for his services." This charge was excepted to and is assigned as error.

The defendant Blount requested the following instruction: "If it is shown in evidence that the property sold was not the property of B. W. Blount, and that the plaintiff knew this, and that Blount was only acting in a representative capacity, then the plaintiff cannot recover from Blount, but if he has any rights it would be against the owners of the property." The court refused to give this instruction and this ruling is assigned as error.

There is no question here but that Mr. Blount was the authorized agent of the owners of the property in selling it to McGehee.

In the case of Whitney v. Wyman, 101 U. S. 392, it is laid down as law in the body of the opinion: "Where the question of agency in making a contract arises there is a broad line of distinction between instruments under seal, and stipulations in writing not under seal, or by parol. In the former case the contract must be in the name of the principal, must be under seal, and must purport to be his deed, and not the deed of the agent covenanting for him (quoting Stanton v. Camp, 4 Barb. N. Y. 274.) In the latter case the question is always one of intent, and the court being untrammelled by any other consideration is bound to give it effect. As the meaning of the law-maker is the law, so the meaning of the contracting parties is the agreement. Words are merely

the symbols they employ to manifest their purpose that it may be carried into execution. If the contract be unsealed and the meaning clear, it matters not how it is phrased, nor how it is signed, whether by the agent for the principal or with the name of the principal by the agent or otherwise. The intent developed is alone material, and when that is ascertained it is conclusive. Where the principal is disclosed and the agent is known to be acting as such, the latter cannot be made personally liable unless he agreed to be so."

In section 558 Mechem on Agency, it is said: "Where dealings are had with the agent of a known principal, the legal presumption is, as has been seen, that the credit was given to the principal rather than to the agent personally, and this presumption will prevail in the absence of evidence that the credit was given exclusively to the agent, and the burden of proof rests upon the party alleging it. Where however the contract or dealings are such as prima facie bind the agent, the burden of proof that in fact they bound the principal, is upon the agent." See also Reinhard on Agency, § 206.

The charge given by the trial judge was, it seems to us, liable to mislead the jury under the circumstances into supposing that a party dealing with a known agent may himself, and without regard to the consent or promise of the agent, fix the terms upon which he will deal with the latter. It says nothing about the necessity of such a promise or agreement. If the jury took this view of the charge and they may have done so, they were mislead; for that is not the law. If Blount was acting in the premises as the agent of the owners of the Umatilla tract of land, and that fact was known to Tomlinson, he would not be personally liable to Tomlinson for commissions unless he expressly promised Tomlinson to be personally liable. The burden was on Tom-

linson to establish such a promise by the preponderance of the evidence. Blount emphatically denies that he ever made such a promise. That was the issue to be tried in this case, and the law applicable to this issue should have been given to the jury. We do not think the law applicable to the evidence is clearly stated in the judge's charge. What we have said of the charge of the judge which was excepted to applies to the instruction which was refused. While this instruction perhaps correctly states the general rule as to the personal liability of an agent, it does not recognize the fact that an agent by his express promise or agreement can make himself personally liable. This instruction did not, therefore, cover the real issue made in this case by the conflicting testimony of Blount and Tomlinson. We do not think the judge erred in refusing to give this instruction.

There are some other assignments of error relating to the admission and rejection of testimony, but we do not think them of sufficient importance to justify a further discussion.

The judgment of the Circuit Court is reversed.

TAYLOR and PARKHILL, JJ., concur;

SHACKLEFORD and COCKRELL, JJ., concur in the opinion.

WHITFIELD, C. J., disqualified.