**In re Lawrence D. JACOBS, Debtor.**

**ProSports Management of the South, Inc., Plaintiff,**

v.

**Lawrence D. Jacobs, Defendant.**

**Bankruptcy No. 98–10075–3P7. Adversary No. 99–85.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 18, 2000.

S. Grier Wells, Jacksonville, FL, for plaintiff.

Lansing J. Roy, Jacksonville, FL, for defendant.

Valerie Hall Manuel, Jacksonville, FL, Chapter 7 Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Chief Judge.

This adversary proceeding came before the Court upon the four-count complaint filed by Plaintiff, ProSports Management of the South, Inc. ("ProSports") for breach of fiduciary duty, embezzlement, conversion and civil theft, and to determine the dischargeability of such debt pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). (Adv. Doc. 1.) Defendant, Lawrence D. Jacobs ("Jacobs") filed an answer and affirmative defenses. (Adv. Doc. 4.) On October 13, 1999 the Court held a trial on all issues and requested written submissions in lieu

of closing oral argument. (Adv. Doc. 8.) Upon review of the evidence presented and the submissions of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Robert Bond ("Bond"), Dan St. John ("St. John") and Jacobs began a business relationship in late 1992 or early 1993, and subsequently incorporated as ProSports on or about December 15, 1993. (Pl.'s Ex. 3.)

2. Bond, St. John and Jacobs formed ProSports for the purpose of providing a full range of services to professional athletes, including professional sports contract negotiations, transition services and personal financial management. (Pl.'s Ex. 1.) ProSports charged a four-percent commission fee for their services, including representation with contract negotiations and financial service consulting. (Pl.'s Ex. 38 at 67-68.) However, ProSports charged a separate fee for the negotiation of endorsements. (Id.)

3. From December 15, 1993 until approximately March 1996 the Board of Directors of ProSports was comprised of Jacobs, Bond and St. John, with St. John serving as Chairman of the Board. (Pl.'s Ex. 3.) During the same period, Jacobs was President of ProSports, St. John was Chief Executive Officer, and Bond was Vice President, Secretary and Treasurer. (Pl.'s Ex. 3; Oct. 13, 1999 Tr. at 28.)

4. The stock of ProSports was distributed among Bond, St. John and Jacobs in the following amounts: 450 shares to Bond, 450 shares to St. John, and 100 shares to Jacobs. (Pl.'s Ex. 37 at 19.) The distribution of shares was to memorialize the capital contributions of St. John and Bond, while at the same time to provide Jacobs with an ownership interest, although he had not made any capital contributions. (Id.) The profits were to be split equally between the three individuals after the satisfaction of the capital contributions by Bond and St. John. (Id. at 20.)

5. From January 1993 to September 1996 Bond and St. John provided in excess of $120,000 in net capital to ProSports, including contributions to cover expenses and Jacobs' salary. (Pl.'s Ex. 36 at 26.) Jacobs did not contribute any capital to ProSports, other than what Jacobs referred to as "sweat equity." (Tr. Oct. 13, 1999 at 71.)

6. From January 1993 through March 1996 ProSports paid Jacobs a salary and reimbursed him for expenses incurred while soliciting clients and negotiating their contracts. ProSports funded Jacobs' salary and expenses from the capital contributions of Bond and St. John. (Pl.'s Ex. 37 at 39.) Jacobs received a salary of $3,000 per month and personal expenses of between $15,000 and $20,000 per year. (Pl.'s Ex. 37 at 41.) Bond and St. John contend they took only one draw during this period in the amount of $10,000 each. (Pl.'s Ex. 36 at 74.)

7. From December 15, 1993 until approximately March 1996 Jacobs was charged with the responsibility of soliciting athletes and negotiating professional sports contracts on behalf of ProSports. (Tr. Oct. 13, 1999 at 25-26.) Jacobs is licensed as a contract advisor by the National Football Player's Association ("NFLPA") to negotiate player contracts with National Football League ("NFL") teams. (Pl.'s Ex. 30.) Throughout Jacobs' association with ProSports, the corporation paid Jacobs' annual fee as a contract advisor to the NFLPA.

8. Prior to his association with ProSports, Jacobs was affiliated with Steve Zucker, an NFLPA contract advisor in Chicago. (Tr. Oct. 13, 1999 at 69-70.) Through his prior relationships and connections with the University of Florida, Jacobs met various football players and their families. As a result, Jacobs befriended the Carter family, one of whose sons, Kevin Carter, was a football player from the University of Florida. Subsequently, on January 6, 1995 ProSports, by Jacobs as President, entered into a Stan-

dard Representation Agreement with Kevin Carter, individually. (Pl.'s Ex. 7.) Kevin Carter also executed a ProSports Employment Agreement on the same date. (Pl.'s Ex. 6.) However, because ProSports, the corporation, could not act as an NFLPA contract advisor, a new Standard Representation Agreement was executed between Kevin Carter, individually, and Jacobs, as President of ProSports on May 22, 1995. (Pl.'s Ex. 11.) On July 16, 1995 Kevin Carter signed an NFL player contract with the St. Louis Rams. (Pl.'s Ex. 16.)

9. On or about August 7, 1995 Jacobs received a total of four checks from Virginia Carter, Kevin Carter's mother, on behalf of Kevin Carter, as payment of four ProSports invoices issued to Kevin Carter dated August 1, 1995:

a. Check number 553 in the amount of $8,711.05 payable to ProSports Management Inc. for "expenses/miscellaneous", which was deposited into ProSports' corporate account. (Pl.'s Ex. 29.)

b. Check number 554 in the amount of $40,000 made payable to Larry Jacobs/ProSports Management for payment of "4% of $1,000,000 for 7/19/95", which was deposited into ProSports' corporate account. (*Id.*)

c. Check number 555 in the amount of $40,000 made payable to Larry Jacobs/ProSports Management for "4% of 9/1/95 signing bonus", which was deposited by Jacobs into his personal bank account; (*Id.*) and

d. Check number 556 in the amount of $20,560 made payable to Larry Jacobs/ProSports Management for "4% of 1995 Salary", which was deposited into ProSports' corporate account. (*Id.*)

10. On or about August 7, 1995 Jacobs opened a bank account at Community First Bank in Jacksonville, Florida, under the account name "Larry Jacobs d/b/a ProSports Management of the South, Inc." In the account documentation, Jacobs represented to Community First Bank that ProSports was a sole proprietorship. (Pl.'s Ex. 31.) Jacobs and Bertha Jacobs, his mother, were the only two signatories on the account. (*Id.*) Jacobs opened the account with the Carter check number 555 in the amount of $40,000. (*See supra* ¶ 9, d.)

11. On or about November 3, 1995 Jacobs received a check in the amount of $24,000 from Virginia Carter, on behalf of Kevin Carter, as a third payment of the 4% signing bonus, which was endorsed and deposited by Jacobs into ProSports' corporate account. (Pl.'s Ex. 29.)

12. On or about December 1, 1995 Kevin Carter terminated his business relationship with ProSports and Jacobs. (Pl.'s Ex. 37 at 55–56.) However, despite the termination, Kevin Carter continued to owe commissions to ProSports pursuant to the Standard Representation Agreement and the Employment Agreement. (Pl.'s Ex. 29.)

13. On January 17, 1996 Bond and St. John met with Kevin Carter and Virginia Carter to negotiate an agreement as to the final obligations owed by Kevin Carter to ProSports pursuant to the Standard Representation Agreement. (Pl.'s Ex. 37 at 54.) During the meeting, Kevin Carter offered to make three installments in the amount of $95,560 each for a total payment of $286,000. Bond and St. John accepted this settlement proposal on behalf of ProSports. (Pl.'s Ex. 35 at 70–71.)

14. On or about February 6, 1996 Virginia Carter, on behalf of Kevin Carter, delivered a check to ProSports made payable to Larry Jacobs/ProSports in the amount of $95,560. (Pl.'s Ex. 35 at 72.)

15. However, on or about February 26, 1996 without the knowledge or consent of ProSports, Jacobs negotiated an alternative settlement with Kevin Carter, and agreed to accept $200,000 as complete settlement of any amounts owed pursuant to the Standard Representation Agreement

and the Employment Agreement. (Tr. Oct. 13, 1999 at 66; Pl.'s Ex. 35 at 74.)

16. Based in part upon Jacobs' refusal to sign the initial settlement check of $95,-560 negotiated by Bond and St. John, and Virginia Carter's discussion with the NFLPA, the check was returned to Virginia Carter. (Tr. Oct. 13, 1999 at 58, 63–64.) Instead, pursuant to the alternative settlement, Virginia Carter gave Jacobs two replacement checks of $50,000 and $150,000, both of which were made payable to Larry Jacobs, individually. (Pl.'s Ex. 27.)

17. Notwithstanding repeated requests, Jacobs has refused to return to ProSports the total of $240,000 received by him from Kevin and Virginia Carter which he deposited in his individual account. (Tr. Oct. 13, 1999 at 65; Def.'s Ex. 39.)

18. On November 24, 1998 Jacobs filed a voluntary petition for relief under Chapter 7 in this Court. (Doc. 1.)

19. On March 15, 1999 ProSports filed a Complaint to Determine Dischargeability of Debt and for Damages against Jacobs for breach of fiduciary duty, embezzlement, conversion and civil theft. (Adv. Doc. 1.)

20. ProSports asserts that Jacobs, as President and a member of the Board of Directors, owed ProSports a duty to perform his functions in an ethical, honest and forthright manner, and that this relationship is sufficient to find that he was "acting in a fiduciary capacity" within the context of 11 U.S.C. § 523(a)(4). (Pl.'s Mem. at 8–13.) ProSports asserts that Jacobs breached his fiduciary duties to ProSports with respect to the $240,000 received from the Carter family, as well as the $86,000 reduction in the amount owed by Kevin Carter to ProSports. (Id. at 7, 13–18.) ProSports also contends that Jacobs committed theft in the form of conversion, larceny, and embezzlement and thus, it is entitled to treble damages and attorneys' fees and costs pursuant to Florida's civil theft statute. (Id. at 15–18.) Accordingly,

ProSports urges the Court to except these debts from Jacobs' discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). (Id.)

21. Jacobs contends that because the NFLPA does not allow a corporation to serve as a licensed contract advisor, it is clear that Jacobs, individually, entered into the Standard Representation Agreement with Kevin Carter. (Def.'s Br. at 8–14.) Jacobs asserts that the key legal issue in this entire lawsuit hinges on the legal effect of the words "Larry Jacobs, President ProSports Management" typed under Larry Jacobs' signature on the Standard Representation Agreement. (Id. at 9.) Jacobs argues that under Florida law, the mere addition of this official designation, without more, is merely a description, and the signatory is the contracting party. (Id.) Thus, Jacobs contends that he did not receive the $240,000 on behalf of ProSports and as such, there is no debt owing from him to the corporation. (Id. at 14–20.) Jacobs argues that because the commissions from the Standard Representation Agreement are his, and because he was not a fiduciary to ProSports for bankruptcy purposes, the alleged debts set forth in this adversary proceeding should not be excepted from his discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). (Id. at 21–24.)

## CONCLUSIONS OF LAW

The discharge of debts is undoubtedly the philosophical and practical centerpiece of the Bankruptcy Code, and the heart of the "fresh start provisions". See Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir.1986). Accordingly, exceptions to discharge must be strictly construed against a creditor to comport with the "fresh start" philosophy underlying bankruptcy law. Id. A creditor seeking to except a debt from discharge bears the burden of proof as to each element by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**I. 11 U.S.C. § 523(a)(4)**

ProSports contends that the debt it is owed is excepted from Jacobs' discharge pursuant to 11 U.S.C. § 523(a)(4), which provides in relevant part: "A discharge under Section 727 ... of this title does not discharge an individual from any debt—(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny ..." 11 U.S.C. § 523(a)(4) (West 2000).

**A. Fraud or defalcation while acting in a fiduciary capacity**

While federal law determines whether an individual acts in a fiduciary capacity under § 523, state law is instructive when determining whether a trust relationship exists. *See Ploetner–Christian v. Miceli (In re Miceli)*, 237 B.R. 510, 515 (Bankr.M.D.Fla.1999) (citation omitted). However, "the traditional meaning of the term 'fiduciary'—a relationship involving confidence, trust and good faith—is far too broad for bankruptcy purposes." *Clark v. Allen (In re Allen)*, 206 B.R. 602, 606 (Bankr.M.D.Fla.1997) (quoting *Liberty Nat'l Bank v. Wing (In re Wing)*, 96 B.R. 369, 374 (Bankr.M.D.Fla.1989)). As this Court has previously noted, "[t]he fiduciary relationship necessary for an exception to discharge requires the existence of an express or technical trust." *Allen*, 206 B.R. at 606. This express or technical trust requirement exists when there is a segregated trust res, an identifiable trust beneficiary, and trust duties established by contract, statute or possibly common law. *See Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993). However, as this Court recently determined, the fiduciary duty owed to a corporation by an officer or director under Florida law is insufficient, by itself, to constitute "fiduciary capacity" for § 523 bankruptcy purposes. *See In re Miceli*, 237 B.R. at 516 (adopting holding in *Florida Dep't of Ins. v. Blackburn (In re Blackburn)*, 209 B.R. 4, 9 (Bankr. M.D.Fla.1997)).

In its memorandum, ProSports acknowledges that pursuant to this Court's recent holding in *Miceli*, Jacobs' position with the corporation is insufficient, standing alone, to adequately establish the fiduciary capacity required under § 523. (Pl.'s Mem. at 9–10.) *See Miceli*, 237 B.R. at 515. Nevertheless, ProSports contends that "... the stricter requirements for a fiduciary duty under Section 523(a)(4) are met in this Proceeding." (Pl.'s Mem. at 9–10.) Initially, the Court notes that ProSports neither contends, nor does the evidence indicate, that an express or technical trust was created by contract. ProSports, however, asserts that an affirmative trust duty was imposed upon Jacobs via Florida common law, which provides that "the relationship of director and officer to its stockholders is that of a fiduciary." (Pl.'s Mem. at 11) (quoting *Snead v. U.S. Trucking Corp.*, 380 So.2d 1075 (Fla. 1st Dist.Ct.App.1980) (internal quotations omitted)).

However, ProSports' argument is flawed because the broad concept of "fiduciary" under state law is not equivalent to the narrower bankruptcy meaning of "fiduciary capacity" under § 523(a)(4). *See Allen*, 206 B.R. at 606. "While Florida statutes and case law may impose on officers and directors general obligations of good faith and fair dealing that can be described as 'fiduciary duties,'—this does not mean that an officer or director acts in an express or technical 'fiduciary capacity' as a trustee of corporate assets." *See Miceli*, 237 B.R. at 516 (quoting *Kapila v. Talmo (In re Talmo)*, 175 B.R. 775, 778 (Bankr. S.D.Fla.1994)). Therefore, because Florida statutory and case law lack any provision that creates a trust relationship or finds a corporate officer to be a trustee over corporate assets, ProSports has failed to prove that Jacobs was acting in a fiduciary capacity within the context of § 523(a)(4).[1] *See Talmo*, 175 B.R. at 778.

---

1. ProSports also argues that "Jacobs had affirmative trust duties imposed upon him as

trustee of the trust account in which he deposited the segregated funds." (Pl.'s Mem. at

ProSports' unsubstantiated blanket assertion that Jacobs was acting within the narrower bankruptcy meaning of fiduciary capacity is simply not supported by the record. Having determined that Jacobs was not acting within a fiduciary capacity, the Court need not address fraud or defalcation.

### B. Embezzlement

▮▮▮ Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *NesSmith Elec. Co. v. Kelley (In re Kelley)*, 84 B.R. 225, 231 (Bankr. M.D.Fla.1988) (citations omitted). An embezzlement claim requires a showing that the commissions were the property of ProSports, and that Jacobs appropriated the funds for his own benefit. *See Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134, 136 (Bankr. M.D.Fla.1998). While proof of a fiduciary relationship is not necessary to prevail on an embezzlement claim, a showing of fraud or fraudulent intent is. *See Kelley*, 84 B.R. at 231.

▮▮▮ Jacobs' argument against a finding of embezzlement relies entirely on a determination by the Court that the commissions were payable to him in his personal capacity and not on behalf of ProSports. (Def.'s Br. at 17.) Jacobs contends that even though he signed the Standard Representation Agreement "Larry Jacobs, President ProSports Management", under Florida law [2] he is the sole contracting party. (*Id.* at 9–11.) Jacobs

cites two Florida cases to support this proposition. *See Falsten Realty Co. v. Kirksey*, 103 Fla. 225, 137 So. 267 (1931); *Manufacturers' Leasing, Ltd. v. Fla. Dev. & Attractions, Inc.*, 330 So.2d 171 (1976). Jacobs is correct that the addition of the general term "president", "agent" or "trustee" to a signature does not exculpate the signatory from responsibility under the contract. *See Manufacturers' Leasing, Ltd.*, 330 So.2d at 172. However, the law is settled that where an agent properly signs for a known principal, the name of the principal appears in the instrument, and it is evident from the writing as a whole that the intention was to bind the principal and not the agent, then the principle is the sole contracting party. *See Whitney v. Wyman*, 101 U.S. 392, 395, 25 L.Ed. 1050 (1879); *Blount v. Tomlinson*, 57 Fla. 35, 42–43, 48 So. 751 (1909); *Tedder v. Riggin*, 65 Fla. 153, 154, 61 So. 244 (1913); *Falsten Realty Co.*, 103 Fla. at 230, 137 So. 267; *Hunt v. Adams*, 111 Fla. 164, 165–66, 149 So. 24 (1933). This is clearly a case of an agent signing for and on behalf of a known principal. *See E.I. Du Pont De Nemours & Co. v. Barge Carriers*, 55 F.Supp. 728, 729 (S.D.Fla.1944).

▮▮▮ Based on the foregoing, the Court finds that Jacobs contracted with Kevin Carter on behalf of ProSports in his capacity as president of the corporation. Therefore, Jacobs was not the lawful owner of the commissions entrusted to him by Virginia Carter and Kevin Carter. The Court finds Jacobs' testimony that he believed the commissions belonged solely to him as the contract advisor to be unbelievable.[3]

---

11.) However, there is no evidence of a contract that imposed affirmative trust duties upon Jacobs. Moreover, ProSports cites no Florida cases or statutes, and the Court finds none on point, that otherwise support the theory that Jacobs had any affirmative trust duties to ProSports with respect to this bank account. Therefore, ProSports has failed to set forth sufficient evidence to support a finding that Jacobs' account established an express or technical trust within the contemplation of § 523.

2. The Standard Representation Agreement provides: "This Agreement shall be construed, interpreted and enforced according to the laws of the State of Florida." (*See* Pl.'s Ex. 11 at ¶ 13.)

3. Jacobs' testimony generally lacked credibility. For example, Jacobs provided the following answers on direct and cross examination:

Q: Okay. And what is your education beyond high school?

A: Some college at Edward Waters College and University of Washington.

Also, Jacobs' actions demonstrate his knowledge that the funds belonged to ProSports. For example, Jacobs endorsed all checks for ProSports even after initially depositing the $40,000 check into his separate account. In fact, Jacobs deposited three other checks from Kevin Carter into ProSports' corporate account on the same day he diverted the $40,000 for his own use. Moreover, Jacobs continued to make deposits into the corporate account until he obtained the $200,000 settlement from the Carters on February 26, 1996. While Jacobs may have been entitled to share in the commissions as a shareholder of ProSports, he was not entitled to any portion of the proceeds until distribution by the corporation. Accordingly, ProSports was the lawful owner of the commissions and Jacobs was required to turn over all of the funds to the corporation.

 In his position as President and a director of ProSports, Jacobs fraudulently appropriated $240,000 in commissions he received on behalf of the corporation when he diverted those funds for his individual use. Because Jacobs had the specific intent to deprive ProSports of the commissions for his own use and benefit; Jacobs' misappropriation of the funds constitutes embezzlement pursuant to § 523(a)(4). While a finding of nondischargeability for embezzlement would ordinarily end the Court's inquiry, the Court finds it necessary to note that Jacobs' debt would likewise be excepted from discharge for larceny.

## C. Larceny

 Larceny is defined as the fraudulent taking and carrying away of property of another with the intent to convert such property to his own use without the consent of another. *See Miceli*, 237 B.R. at 517 (citation omitted). The preponderance of the evidence demonstrates that Jacobs committed larceny by fraudulently taking $240,000 in funds from Virginia Carter on behalf of Kevin Carter, with the intent to convert such money to his own use without the consent of ProSports, the lawful owner of the funds. Accordingly, this debt is also nondischargeable under § 523(a)(4)'s larceny provision.

## II. 11 U.S.C. § 523(a)(6)

 Because the $240,000 in commissions is nondischargeable based upon the Court's finding of embezzlement and larceny, the Court need not discuss this entire portion of ProSports' claim under § 523(a)(6).[4] However, the Court will address Jacobs' actions in negotiating the $200,000 alternative settlement in order to ascertain whether or not the $86,000 reduction from the previous settlement reached by ProSports falls within the "willful and malicious injury" exception to discharge. Section 523(a)(6) provides for

Q: All right. And what degrees did you obtain?
A: I'm not—I won't say I have a B.A. or a B.S. I just have, your Honor, a college education at the University of Washington and Edward Waters College, although I do have a bachelor's, but I don't want to say that—
(Tr. Oct. 13, 1999 at 16–17) (direct examination).
Q: Okay, sir. I was unsure of your responses to questions by Mr. Roy. You attended Edward Waters College and the University of Washington. Did you receive a degree from either of those institutions?
A: No, I did not.
Q: You did not?
A: (Shakes head negatively.)

Q: Have you received a college degree from any institution?
A: I have not.
Q: Have you ever testified, Mr. Jacobs, that you had a master's degree in broadcast journalism, broadcast management, and an undergraduate B.A. in English from the University of Washington?
A: I may have, but I don't remember. I may have.
(Tr. Oct. 13, 1999 at 69) (cross examination).

4. The Court need not and will not address the nondischargeable portion of the debt that arose as a result of Jacobs' wrongful diversion of the $40,000 corporate check into his individual account.

an exception to discharge for any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (West 2000). Moreover, previous decisions of this Court have confirmed that a "willful and malicious injury" includes conversion, which is defined as the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights. *See John Deere Co. v. Deresinski (In re Deresinski)*, 216 B.R. 995, 1000 (Bankr.M.D.Fla.1998).

"Willful" requires a showing of an intentional or deliberate act. *See Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 (11th Cir.1995). Malice can be established by a showing of implied or constructive malice. *Cladakis v. Triggiano (In re Triggiano)*, 132 B.R. 486, 490 (Bankr. M.D.Fla.1991). Implied or constructive malice may be established by showing that the debtor deliberately and intentionally committed an act that he knew would necessarily injure a cognizable right of the creditor. *Id.* However, debts arising from recklessly or negligently inflicted injuries do not fall within the willful and malicious injury exception to discharge under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998).

It is apparent that Jacobs acted intentionally when he negotiated the alternative settlement agreement with Virginia Carter and Kevin Carter for $86,000 less than that previously agreed to by ProSports. Jacobs was well aware of the initial settlement between Kevin Carter and ProSports when he negotiated the alternative settlement and agreed to accept $200,000 as complete settlement of any amounts owed pursuant to the Standard Representation Agreement. Jacobs did this with the intention of diverting the settlement funds to himself for his sole benefit. Jacobs knew his actions would necessarily injure ProSports and therefore, his misdeeds were done with the requisite intent to harm the corporation as to the $200,000

actually converted and the $86,000 reduction in the amount owed by Kevin Carter to ProSports. Hence, ProSports has demonstrated that as an approximate result of Jacobs' intentional actions, it has been injured in the amount of $286,000. Based on the foregoing, ProSports has sufficiently proven by a preponderance of the evidence that this amount is nondischargeable pursuant to § 523(a)(6). The Court now turns to ProSports' treble damage claim for civil theft.

### III. Florida Statute § 772.11, Civil remedy for theft

Section 772.11 provides, in pertinent part:

> Any person who proves by **clear and convincing evidence** that he or she has been injured in any fashion by reason of any violation of the provisions of ss. 812.012–812.037 has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

FLA. STAT. ANN. § 772.11 (West 1999) (emphasis added). However, ProSports has only set forth a preponderance of the evidence with respect to its claims against Jacobs for embezzlement, larceny and conversion and therefore, has failed to meet the clear and convincing standard of proof required to establish civil theft pursuant to Florida's civil theft statute. Accordingly, ProSports is not entitled to an award of treble damages.

### CONCLUSION

As a result of Jacobs' embezzlement, larceny and intentional infliction of a willful and malicious injury upon ProSports, Jacobs' debt of $326,000 to the corporation is excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). However, because ProSports has not met its burden of proof by clear and convincing evidence, it is not entitled to treble dam-

ages under Florida's civil theft statute. Furthermore, the Court finds that the record does not support Jacobs' affirmative defenses.[5] A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

---

**5.** The Court finds Jacobs' affirmative defenses to be without merit. First, Jacobs has failed to offer any credible evidence of bad faith or deceptive acts on behalf of Bond or St. John that would support a finding that ProSports acted with unclean hands. Second, Florida's economic loss rule does not bar this proceeding because the essence of the complaint involves breach of fiduciary duty, larceny, embezzlement and conversion; not breach of contract. Third, the record is clear that Jacobs did not act in good faith, but instead acted with fraudulent intent and malice. Fourth, ProSports, not Jacobs, was the lawful owner of the proceeds entrusted to him by Virgina Carter and Kevin Carter. Fifth, as illustrated in the Court's Findings of Fact and Conclusions of Law, ProSports' complaint states viable causes of action under §§ 523(a)(4) and (a)(6). Sixth, Jacobs' obligation to repay ProSports arises from his tortious action, not from a breach of contractual duty.